[Civ. No. 15577. First Dist., Div. One. Jan. 21, 1954.]

ANN ROUSSEAU, Appellant, v. VIRGINIA HURTADO, Individually and as Executrix, etc., et al., Respondents.

Ann Rousseau, in pro. per., for Appellant.

Tobin & Tobin, Charles R. Collins and O'Gara & O'Gara for Respondents.

PETERS, P. J.—Josephine B. McConnon died December 31, 1949, at the age of 86, leaving as her principal estate a valuable piece of real property on Fell Street in San Francisco, on which two buildings had been constructed. One building consisted of a garage and three apartments, the other consisted of four flats. After her death the plaintiff, Ann Rousseau, grandchild of the deceased, claimed the property by virtue of a purported deed from her grandmother dated January 5, 1931, and recorded February 5, 1931, at a

time when Ann was 9 years old and her grandmother was 68. Virginia Hurtado, a daughter of Josephine, claimed the property by virtue of a will in which she was named sole legatee. Two sons of the deceased, Joseph and John McConnon, and another daughter, Kathleen Rousseau, mother of Ann, claimed shares in the property as heirs of their mother. Virginia presented the will, naming her as legatee, for probate, and her sister and brothers have contested the probate of this will. That action has not yet been tried, having been stayed to await the outcome of the instant case. The present case was instituted by Ann to quiet her title to the property against the claims of her aunt and uncles, to enjoin other claims, and for an accounting against Virginia, who is executrix of the estate. John and Joseph McConnon answered, challenging the allegations of the complaint, alleging that the property belonged to the estate of decedent, that the signature on the deed through which Ann claims was forged, and that such deed had not been delivered. These defendants also alleged title by adverse possession in the estate, and counterclaimed to quiet the title of the property in the estate. John claimed a lien for $8,000 on the property. Virginia's answer, individually and as executrix, alleged that the property belonged to the decedent at all times here relevant prior to her death, and also alleged title in her mother by adverse possession. She cross-complained as executrix, asking that title be quieted in the estate on the ground of the nonexecution and nondelivery of plaintiff's deed, and on the ground of adverse possession.

Kathleen, mother of Ann, was named by Ann as a defendant, but she defaulted. Two corporate defendants claim no interest in the property. Thus, the situation is one where Virginia, John and Joseph are aligned in this case in opposition to their niece Ann, but John and Joseph oppose Virginia in the will contest. Kathleen is aligned with John and Joseph in the will contest, but in this case supports her daughter Ann.

The case proceeded to trial before the court without a jury. At the trial all parties were represented by counsel, but on this appeal Ann has elected to appear in propria persona. The trial court found that the decedent owned the property at the time of her death; that Ann had never had any rights therein; that the deed through which Ann claims was recorded February 5, 1931, but that it had not been "executed or signed by the said Josephine B. McConnon or by her filed for record"; that it had not been delivered to Ann or to

anyone on her behalf with the intent to convey title; that Ann never obtained any interest in the property during the decedent's lifetime; that Ann at no time during decedent's lifetime asserted ownership of the property, enjoyed the right of possession, or claimed any rentals or even knew of the amounts of the rentals, taxes or insurance. The court then made appropriate findings in favor of respondents on the issue of adverse possession. The court also found that John McConnon had a valid lien on the property in the amount of $8,000. The judgment provided that Ann has no title to the property, enjoined her from asserting any claim thereto, and decreed that whoever prevailed in the pending will contest was the owner of the property subject to administration and to the prior lien. After denial of her motion for a new trial and of a motion to correct the transcript (in immaterial respects) Ann appeals.

This is the general background of this controversy. As might be expected, much of the evidence is highly conflicting and the issues are primarily factual. Appellant has seen fit to present her appeal by making many of the arguments made by her then counsel in the trial court and by quoting from the trial brief prepared by him. Many of these arguments, proper in the trial court, relate to conflicts in the evidence and to the credibility of the witnesses. These arguments, of course, are not proper in the appellate court.

The plaintiff's case in chief was very brief, covering but a few pages in the 415-page transcript. Her case consisted of stipulations that Josephine had died December 31, 1949, and that since that date Virginia had been in continued possession of the property and had rendered no accounting; of a certified copy of the record of a deed from Josephine to Ann dated January 5, 1931, and acknowledged and recorded February 5, 1931; of a certified copy of the birth certificate of Ann showing that she was born July 25, 1921; of a certified copy of the record of a deed of reconveyance by which Ann purported to reconvey the property to Josephine[1]; and of a certified copy of the deed of trust, dated August 31, 1948, from Josephine to the title company as

---

[1]No facts surrounding this reconveyance appear in the record. The deed was introduced by Ann, and that is all that the record discloses about it. Ann asserts, and respondents do not deny, that this reconveyance dated June 19, 1931, was void, inasmuch as Ann was then a minor. This assertion is in accordance with the settled law. (Civ. Code, § 33; *Lee* v. *Hibernia Sav. & Loan Soc.*, 177 Cal. 656 [171 P. 677]; *Hakes Investment Co.* v. *Lyons*, 166 Cal. 557 [137 P. 911].)

trustee for John McConnon. After the introduction of this evidence Ann rested, announcing through her trial counsel that for the balance of her case she relied upon the presumptions arising out of the execution and recordation of the deed to her. Thus, no direct evidence at all was introduced by plaintiff in her case in chief concerning the circumstances surrounding the claimed execution of the deed, of its asserted delivery, or even that the signature on the deed was that of Josephine. The document introduced was a certified copy of the recorder's record into which, upon recordation, the deed, including the signatures, was typed. The original deed was not produced, nor was its absence then explained. All evidence on these and other issues was introduced by defendants. Most of this evidence was produced from Ann or from her mother Kathleen, produced under section 2055 of the Code of Civil Procedure, and by reading into evidence the deposition of Mayzellia A. McCarthy, an old family friend, which deposition was taken by plaintiff but not introduced by her.[2] Mrs. McCarthy, who claimed to be an eyewitness to the delivery of the deed, was 76 years old when her deposition was taken in May of 1950, and had died prior to the trial which took place in May of 1951.

Mrs. McCarthy unequivocally testified that she saw a deed delivered by Josephine to Ann. She was positive that this occurred in March of 1931 at a birthday party of the McConnons and Rousseaus held at the home of the Rousseaus in Belmont, California. She testified that after the men had left

---

[2]This deposition was first introduced into evidence by counsel for Virginia Hurtado, without limitation. After it had been introduced, respondents urged that it was being offered under section 2055 of the Code of Civil Procedure. The appellant objected to its so being introduced and the trial court reserved its ruling, and did not thereafter rule upon the point. Thus, it seems that the deposition was read into evidence on behalf of respondents. Although the point is not urged by the parties, it should be mentioned that since Mrs. McCarthy was made a witness for the respondents, they were prohibited by law from impeaching her. But such prohibition did not extend to the introduction of evidence that contradicted her. (Code Civ. Proc., § 2049; *Norwood* v. *Kenfield,* 30 Cal. 393; *Greenleaf* v. *Pacific Tel. & Tel. Co.,* 43 Cal.App. 691 [185 P. 872]; *Callahan* v. *Danziger,* 32 Cal.App. 405 [163 P. 65]; *Winslow* v. *Glendale Light etc. Co.,* 12 Cal.App. 530 [107 P. 1020].) This is important because Mrs. McCarthy was very definitely contradicted by Virginia, Joseph and John, who, as will later appear, testified to facts, believed by the trial court, that it was impossible for Mrs. McConnon to have been in Belmont at any time even close to the time when the deed is asserted to have been delivered. It is partly upon this evidence that the trial court based its finding that the deed had not been executed or delivered.

the table she, Josephine, Kathleen and Ann had a conversation; that ''Grandma McConnon gave Ann a paper and she told her to give it to her mother to keep 'for you.' And so Ann handed it to her mother''; that Kathleen then handed the paper to the witness who read enough of it to see that it was a deed from Josephine to Ann; that Kathleen expressed surprise and asked why Josephine had thus given her property to Ann; that Josephine replied: ''That is my business.'' The witness was positive that the document was a deed; that it was dated in 1931; that it had been recorded when she saw it, and that Ann accepted it. She was sure that the name of Josephine McConnon appeared as grantor and that of Ann Rousseau as grantee, and she rather ambiguously testified that she recognized the signature as that of Josephine, but she was not positive that in March of 1931 she had been familiar with that signature, although she had become familiar with it since that time. On cross-examination she testified that she only ''thought'' it was Josephine's signature. This witness was quite detailed in her testimony about the delivery of the deed, but somewhat vague about other occurrences of later date. She was pretty sure that the deed referred to San Francisco property.[3] The witness also testified that later that same day she had another conversation with Josephine; that she asked Josephine why she had given the property to Ann rather than to her mother, Kathleen, who was then married to a disabled husband; that Josephine replied that Ann was her ''namesake'' (Ann's middle name is Josephine), and that she wished to keep the property out of the hands of Protestant women; that Kathleen was married to a Protestant and the two boys were likely to marry Protestants; that Ann undoubtedly was and would remain a good Catholic. This witness testified that over the years at undetermined times Josephine had repeated these statements to her.

The witness admitted a close relationship with Kathleen and Ann, admitted taking trips with them, and admitted that Kathleen and she had testified for each other in prior lawsuits. In one important respect this witness was directly contradicted by the testimony of Ann. Mrs. McCarthy testified that, prior to the taking of her deposition, she had refused to talk to ''Mrs. Rousseau or anybody'' about the case; that,

---

[3]The only real property then or thereafter owned by Josephine in San Francisco is the Fell Street property. The decedent in 1931 and thereafter did own an unimproved lot in Santa Cruz County.

although she was staying at the Rousseau home when her deposition was taken and had driven from Belmont to San Francisco with the Rousseaus that day, she had not discussed the case with them; that she had been asked to become a witness only after she had driven north with Ann's brother from her home in San Diego, in order to attend to her personal affairs, and did not even know about the litigation until after she arrived in Belmont. The witness also could not remember even talking the case over with Ann's lawyers before the deposition was taken. Ann, however, admitted, when called as a witness under section 2055 of the Code of Civil Procedure, that, prior to taking Mrs. McCarthy's deposition, she and her mother, father and brother had driven to San Diego for the purpose, among others, of interviewing Mrs. McCarthy to find out what she remembered about the delivery of the deed; that at that time Ann asked her if she remembered the events at the birthday party, to which she answered that she did. Thereupon, Kathleen asked Mrs. McCarthy if she would be willing to come to San Francisco and testify to what she remembered; that Mrs. McCarthy agreed to do so, and then Mrs. McCarthy drove north with the entire Rousseau family. She spent several weeks, before her deposition was taken, in San Mateo County, during which time she saw the Rousseaus frequently, and, on occasions during this period, stayed at the Rousseau home.

Ann, the appellant, was called as a witness by respondents under section 2055 of the Code of Civil Procedure. Although she was only 9 in March of 1931, being 29 at the time of trial, she had a clear and independent recollection of the delivery of the deed, and was quite clear that it had been delivered to her in March of 1931. As to the actual events of the delivery to her of the deed, of the handing of it to her mother, of her mother handing it to Mrs. McCarthy, and of what was then done and said, her testimony is substantially similar to that of Mrs. McCarthy. It should be mentioned, however, that this witness was quite vague and uncertain about all of the other happenings of that day.

Ann's mother, Kathleen, also called under section 2055, testified that the delivery of the deed occurred at the birthday party described by Mrs. McCarthy, was clear that this party was held early in March, 1931, and generally agreed with Mrs. McCarthy as to what was then done and said. She identified the copy of the recorder's deed as a copy of the original that had then been delivered to Ann. She testified

that the original deed had been in her possession for many years; that it had been kept in an envelope in a safe in the post office at San Mateo where she was postmistress until 1939; that she left it there in the safe when she left that job; that she last saw the deed in November of 1939; that later when she removed her papers from the safe she did not remember removing the deed; that when she looked for it after Josephine's death it could not be found. Ann corroborated this story in some respects.

There was substantial and credible evidence introduced by respondents, and apparently believed by the trial court, to the effect that Mrs. McConnon could not have been present at the birthday party in March of 1931. Other than the birthday party neither Ann nor Kathleen could recollect any other visits to, or of, Josephine in the first three months of 1931. Both admitted that, during the late fall of 1930, Josephine was in Reno with Virginia who was securing a divorce. Virginia testified that after she and Josephine returned from Reno at the end of 1930 Josephine lived with her constantly until the middle of May, 1931, and that during this period Mrs. McConnon did not and could not have visited Belmont. All during this period, from the end of 1930 until the middle of May, 1931, when Josephine returned to her Fell Street home, Josephine spent all of her nights with Virginia in the same house. Virginia was positive that from the fall of 1930 until after May of 1931 there had been no contact at all between Josephine and the Rousseaus; that the Rousseaus during this period could not have known that she and Josephine had returned from Reno, and that her brother Joseph was the only one who knew that they had returned. She testified that from the beginning of 1931 to May of that year Josephine never left the home where she was living with Virginia alone, and so could not have been present in Belmont in March of 1931. Most of this testimony was strongly corroborated by Joseph.

Ann and Kathleen also testified that the relationship between Josephine and Ann before and after the delivery of the deed was close and affectionate, and remained so until Josephine's death; that Ann frequently visited her grandmother and accompanied her to various places; that in 1930 Ann was a frequent visitor to the home of her grandmother; that in 1932 or 1933 Ann lived with Josephine for a full year while attending school; that starting in 1942 or 1943 she spent two full years at the McConnon residence; that

thereafter she considered the McConnon house her residence, and spent at least half of her time there. But this testimony was directly contradicted by others. Albert Hurtado, a son of Virginia, lived at the McConnon house from 1942 on. He testified that from that date Ann only occasionally visited her grandmother; that she did not regularly stay at the house; that she would occasionally stay overnight when her work in San Francisco made it inconvenient to return to Belmont; that she never stayed as long as a week. Virginia, who lived with her mother in most of 1942, and who lived with her constantly from 1944 until her death, also agreed that in 1942 Ann had never stayed at Josephine's home for longer than three days at a time, and that thereafter her visits were intermittent and of short duration.

Ann admitted that, after March of 1931 and up until Josephine's death in December of 1949, she had never mentioned the deed to any of the members of the family, but testified that her grandmother on several occasions, after March of 1931, told her that she did not want the others to know that the property had been deeded to her. John McConnon, who lived at the McConnon house until 1934, testified that he had never heard of the deed, nor had he ever heard the Rousseaus make a claim to the property, and Virginia stated that the deed was never mentioned in her presence by the Rousseaus during the decedent's lifetime.

There was other testimony that should be mentioned. Ann, in 1948 or 1949, filed an application for a bond purporting to list all of her assets, but she did not list the property here involved among such assets. Ann also admitted that after 1931 she never discussed the deed with her grandmother, although she stated that she did discuss with her the property generally.

Another fact should be here mentioned. In rebuttal Ann called Gilbert Ferrell, former district attorney of San Mateo County, who had handled various legal matters over the years for Kathleen. He testified that sometime in 1931 the Rousseaus came to him and exhibited a deed from Josephine to Ann, dated in January of 1931, which deed, according to his recollection, appeared to be "properly signed and acknowledged before a notary public and recorded in the City and County of San Francisco."

Ann places some reliance upon the fact that it was stipulated that May H. Farrell, apparently the notary who acknowledged the deed under which Ann claims, from 1931

to date had her business address with Tobin & Tobin, the legal firm that represents Virginia in this litigation. This notary was not produced by Virginia, or by anyone else, as a witness. Ann claims inferences unfavorable to respondents from the failure to produce this witness. ■ Whether adverse inferences should arise from such failure was a question of fact for the trial court. The trial court could have found, and impliedly did so, that such inferences were more than offset by Ann's failure to testify as her own witness, and from her failure to call her mother or to introduce the deposition of Mrs. McCarthy.

The decedent resided in one of the Fell Street apartments from 1931 until her death. The evidence also shows that from 1931 until her death decedent was not only in possession of the premises, but managed them, and collected and disposed of the rents according to her own desires. While Ann testified somewhat ambiguously about helping her grandmother to plan to pay the taxes on the property out of income, and occasionally checked to see that they were paid, there is substantial evidence that Josephine always paid the taxes in cash, usually asking her son John to take the payments to the city hall, and that Ann had nothing to do with them. All taxes were paid. Josephine also paid all insurance premiums. In addition, Josephine, in her own name, executed and recorded mortgages on the property in 1935, 1937 and 1945 to secure debts of $2,500, $1,200 and $500, respectively, and in 1948 decedent declared a homestead on the property. Two of these mortgages were executed while Ann was a minor, but the 1945 mortgage was executed at a time when Ann was 23 or 24. Ann and Kathleen both admitted that Josephine had not discussed these transactions with them, nor did they otherwise know about them when they occurred.

On August 31, 1948 (recorded September 14, 1948), Josephine executed a deed of trust to a title company to secure a promissory note of $8,000 in favor of her son John. He testified that in 1932 and 1933, at his mother's request, he had remodeled one of the buildings from a single family residence into apartments, and, in doing so, had worked for one solid year working nights, and had spent $5,000 of his own money. He also testified that he had not been paid or reimbursed for the labor or expenditures until he received the $8,000 note and deed of trust from his mother. This deed of trust was introduced into evidence by Ann. The trial court determined that this deed of trust was a first lien on

the property. Respondents are not appealing and so do not challenge that determination. Appellant does. But inasmuch as we have determined, as will later appear, that the determination of the trial court that the deed through which appellant claims was never executed, it is apparent that appellant is in no way aggrieved by the determination that John has a lien on property in which she has no interest. Therefore, it is not necessary to pass upon the validity of the trial court's determination in reference to this lien. Its only significance on the present appeal is that it indicates that in 1948 Josephine must have believed that she owned more than a life estate in the property because a life tenant cannot, of course, encumber a remainder interest of record.

There were also introduced into evidence several wills executed by decedent subsequent to 1931 by which the decedent attempted to devise the property in question, which constituted substantially all of her estate, to persons other than Ann. By one of these wills the entire property was devised to Virginia, who, in another proceeding, is contending that the property belongs to her under that document.

 On this appeal, appellant contends that the recordation of her deed gave rise to the presumptions that it had been duly executed and delivered. Such cases as *Willis* v. *Holback*, 33 Cal.App.2d 145 [91 P.2d 140], *Kuenzel* v. *Grettenberg*, 88 Cal.App.2d 656 [199 P.2d 732], and *Rich* v. *Ervin*, 86 Cal.App.2d 386 [194 P.2d 809], discuss the general nature of these presumptions. All of these cases, in which the respective courts used broad language in reference to these presumptions, were affirmances where the presumptions were used, and properly so, to support an affirmative finding of delivery. But, of course, these presumptions are not conclusive, and may be rebutted by other evidence. (*Hill* v. *Hill*, 91 Cal.App.2d 592 [205 P.2d 676].) Here the trial court found that the deed through which appellant claims, although recorded, had not been executed or signed by Josephine, and that Josephine had not delivered it to Ann or to anyone else for her. If the finding that Josephine never executed the deed is supported, all presumptions relevant to delivery and presumed acceptance by a minor become immaterial. This finding is amply supported by substantial and credible evidence.

 Appellant produced a copy of the deed as set forth in the recorder's record. That deed, of course, was wholly

typed; including the signature, so that the authenticity of the signature of the grantor could not be determined. It shows on its face that it was "Recorded at the request of Grantee." The original was not produced. The explanations of how this valuable deed was mislaid and ultimately lost were certainly not very convincing and could be and were disbelieved by the trial court.

Appellant argues at some length, however, that the due execution of the deed was established by the uncontradicted evidence of Mrs. McCarthy, and of Ann and her mother, and corroborated by Gilbert Ferrell. But the difficulty is that although the first three did testify as to the delivery of the deed, and had their evidence been believed it would have supported a finding in appellant's favor, there is substantial evidence to contradict this evidence and the presumptions here involved. It should not be forgotten that appellant did not see fit to produce any of this evidence, and that all three witnesses were produced by respondents. Moreover, the trial court was entitled to disbelieve appellant and her mother, because both were interested witnesses. So far as Mrs. McCarthy is concerned, the trial court was entitled to find, based upon the evidence of Ann and her mother, that she had deliberately falsified her testimony as to the circumstances under which she had appeared as a witness. While she told a detailed story about the delivery of the deed, her recollections of other events of later occurrence were vague and uncertain. These facts would have justified the trial court in disbelieving all of her testimony, and particularly that portion relating to the claimed delivery of the deed. (*Hughes* v. *Maciel*, 138 Cal.App. 509 [32 P.2d 688].) Thus, the trial court could, and apparently did, disbelieve the testimony of these three witnesses. If it be assumed that the presumptions arising from the presentation of a recorded deed would alone support a finding of due execution and delivery, such presumptions were substantially controverted by the other evidence. The evidence shows that the grantee over a period of 18 years while the grantor was alive never asserted ownership of the property, while the grantor, by her actions, frequently asserted such ownership. The purported deed is an absolute one reserving no estate in the grantor, whatsoever. Yet for 18 years the grantor absolutely controlled the property, and its income, mortgaged it, and even willed it away. Moreover, there is substantial and credible evidence that Mrs. McConnon could not have been present in Belmont in March

of 1931 at the birthday party given on that date, and at which the deed is supposed to have been delivered.

Ferrell's testimony does not compel the conclusion that sometime in 1931 the grantees were in possession of a deed properly signed by Josephine McConnon. All that he testified to was that in 1931 Kathleen and Ann were in possession of a deed from Josephine to Ann, but there is no evidence that he knew that the deed had been signed by Josephine, or even that he was familiar with her signature. He did not testify that he knew anything about the claimed delivery of that deed, and so gave no testimony on that issue.

Inasmuch as we have concluded that the findings of non-execution and nondelivery are supported, the judgment must be affirmed. This makes it unnecessary to discuss the propriety of the findings of adverse possession, and the other points raised by appellant.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 17, 1954.